UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
VALERIA M. NUNEZ CRUZ,                          :

                        Plaintiff,              :        12 Civ. 953 (GWG)

        -v.-                                    :        OPINION AND ORDER

MICHAEL J. ASTRUE, Commissioner of              :
Social Security,
                                                :
                        Defendant.
-------------------------------------------------------------X
**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

        Plaintiff Valeria Nunez Cruz brings this action pursuant to 42 U.S.C. § 405(g) to obtain

judicial review of the final decision of the Commissioner of Social Security ("Commissioner")

denying her claim for disability insurance benefits under the Social Security Act.  The

Commissioner moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), and Cruz

has cross-moved for judgment on the pleadings.  The parties consented to having this matter

decided by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  For the reasons

stated below, the Commissioner's motion is granted, and Cruz's motion is denied.

I.      BACKGROUND

        A.      Cruz's Claims for Benefits and Administrative Proceedings

        On March 1, 2007, Cruz filed an application for disability benefits, alleging an onset of

disability as of that date.  See Administrative Record, filed July 6, 2012 (Docket # 12) ("R.")

67–73.  On April 12, 2007, this application was denied.  R. 40–45.  Cruz timely requested a

hearing before an Administrative Law Judge ("ALJ").  R. 46–47.  On November 7, 2007, Cruz

appeared pro se at a hearing before ALJ Robin J. Arzt, and testified through an interpreter.  R.

21–39.  On December 13, 2007, ALJ Arzt issued a decision finding that Cruz was not disabled

1

from March 1, 2007 through the date of her decision.  R. 10–20.  The Appeals Council denied

Cruz's request for review on May 23, 2008.  R. 1–6.  Cruz filed a civil action on August 15,

2008, see Complaint, Nunez Cruz v. Astrue, 08 Civ. 7243 (AJP) (S.D.N.Y. Aug. 15, 2008)

(Docket # 2), and on February 27, 2009, the parties agreed to remand the case for further

administrative proceedings, R. 267–69.

Cruz filed an additional application which was granted in October 2008, and then vacated

by the Appeals Council on the basis that there were inconsistencies in the two applications.  R.

271–74, 279–81.  On August 4, 2009, the Appeals Council issued an order consolidating the two

applications and remanding the case to the ALJ.  R. 276–81.  This remand order stated that the

ALJ should:

> • Obtain additional evidence concerning the claimant's musculoskeletal impairments,
> including physical therapy records, in order to complete the administrative record in
> accordance with the regulatory standards regarding consultative examinations and
> existing medical evidence (20 CFR 416.912–913).  The additional evidence may include,
> if warranted and available, updated records from Dr. Rubin; a consultative neurological
> examination; and medical source statements about what the claimant can still do despite
> the impairments.
>
> • Give consideration to the January 9, 2008 treating source opinion from Dr. Rubin
> pursuant to the provisions of 20 CFR 416.927 and Social Security Rulings 96-2p and 96-
> 5p, and explain the weight given to such opinion evidence.  As appropriate, the
> Administrative Law Judge may request the treating source to provide additional evidence
> and/or further clarification of the opinion and medical source statements about what the
> claimant can still do despite the impairments (20 CFR 416.912).
>
> • Resolve the inconsistencies pertaining to the claimant's ability to speak English.  Dr.
> Rubin should also be asked for her observations about this issue because of the report
> from the subsequent file that was previously referenced.
>
> • Obtain evidence from a medical expert to clarify the nature and severity of the
> claimant's impairments (20 CFR 416.927(f) and Social Security Ruling 96-6p).
>
> • Give further consideration to the claimant's maximum residual functional capacity and
> provide appropriate rationale with specific references to evidence of record in support of
> the assessed limitations (20 CFR 416.945 and Social Security Ruling 96-8p).

• If warranted by the expanded record, obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Rulings 83-12, 83-14, and 96-9p). The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 416.966). Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p).

R. 280–81.

In accordance with this remand order, a new hearing was held before ALJ Mark Solomon on March 1, 2011, at which Cruz testified pro se through an interpreter. R. 205–24. On April 22, 2011, ALJ Solomon issued a decision finding Cruz not disabled since March 1, 2007. R. 170–84. The Appeals Council denied review of this decision on December 16, 2011. R. 160–64. Cruz thereafter filed the instant complaint challenging the Commissioner's denial of benefits. Complaint, filed Feb. 6, 2012 (Docket # 2).

On November 14, 2012, the Commissioner moved for judgment on the pleadings.[1] Cruz, now represented by counsel, see Notice of Appearance, filed Oct. 2, 2012 (Docket # 17), cross-moved for judgment on the pleadings.[2]

---

[1]   See Notice of Motion, filed Nov. 14, 2012 (Docket # 20); Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings, filed Nov. 14, 2012 (Docket # 21) ("Gov. Mem."); Defendant's Memorandum in Opposition to Plaintiff's Motion for Judgment on the Pleadings and in Further Support of the Commissioner's Motion for Judgment on the Pleadings, filed Jan. 9, 2013 (Docket # 28).

[2]   See Notice of Cross-Motion, filed Dec. 29, 2012 (Docket # 25); Memorandum of Law in Support of Plaintiff's Cross-Motion for Judgment on the Pleadings and in Opposition to Defendant's Motion for Judgment on the Pleadings (Docket # 27) ("Pl. Mem.").

B.      The Administrative Record

1.      Background

Cruz was born in the Dominican Republic in 1958.  R. 27, 74, 209.  She completed the
fourth grade in the Dominican Republic.  R. 27–28.  She moved to the United States in 1974
when she was 16 years old, R. 27, and has lived in New York City ever since, R. 28.  She
worked as a home attendant and a floor person in a factory, R. 93, and as a babysitter for a
company called Vista Care, R. 30.  She has not worked since the early 1990's.  R. 29-30.  She
lives with her son and spends her days caring for him.  R. 28, 80.  She is also an avid churchgoer.
R. 83.

2.      Medical Records

In 2005, Cruz began receiving treatment from Gouverneur Diagnostic and Treatment
Center ("GDTC").  R. 154–59.  On November 21, 2005, doctors at GDTC reported the results of
her computerized tomography ("CT") scans.  R. 154–59.  A CT scan of her cervical spine
showed minimal degenerative disc disease.  R. 155.  A CT scan of her thoracic spine showed
minimal scoliosis and calcification of the ligamentum flavum[3] without definite spinal cord
compression.  R. 156–57.  A CT scan of her lumbar spine showed no appreciable scoliosis, "no
evidence of disc herniation or spinal stenosis," and mild central spinal canal stenosis.  R. 159.

In January and March 2006, Dr. Jennifer Adams treated Cruz for cellulitis of the leg and
bilateral edema[4] causing leg swelling.  R. 120–21.  Dr. Adams prescribed Keflex medication, but

---

[3]  The ligamentum flavum is a "yellow elastic fibrous tissue, which bind[s] together the
laminae of adjoining vertebrae, forming the dorsal wall of the vertebral canal between the
vertebra or laminae."  Stedman's Medical Dictionary 1007 (27th ed. 2000) ("Stedman's").

[4]  Edema is "an accumulation of an excessive amount of watery fluid in cells or
intercellular tissues."  Stedman's at 566–67.

noted on March 2, 2006, that Cruz had failed to take the medication consistently.  R. 120.  On

March 13, 2006, Dr. Shirley Tung diagnosed Cruz with chronic venous insufficiency[5] and

recurrent cellulitis of the left leg.  R. 118.  Dr. Tung also noted that a January 2006 test was

negative for deep vein thrombosis, and that Cruz's gait was normal.  Id.  Cruz requested new

support hose.  Id.

In May 2006, Cruz saw Dr. Adams again and requested a letter for Social Security and

"welfare."  R. 116.  Cruz complained of radiating back pain.  Id.  Straight leg raise testing was

negative, and Cruz had good motor and sensory tone, and no pain with palpation.  Id.  Her

existing back pain remained stable.  Id.  Additionally, she complained of fatigue, shortness of

breath, and chest pain, but her lungs were clear, and blood pressure and heart rate were normal.

Id.  Dr. Adams wrote of Cruz's complaints, "IMPOSSIBLE history that changes."  Id.  Dr.

Adams prescribed aspirin and planned a stress test due to changes in Cruz's EKG from a prior

exam.  Id.  In June 2006, Dr. Adams reported that Cruz's blood pressure remained normal, and

the stress test showed diminished functional capacity with no arrhythmias.  R. 115, 123.

An MRI of Cruz's ankle in March 2006 showed soft tissue swelling but no evidence of

fracture, dislocation, or bony destruction.  R. 135.  In October 2006, Cruz saw Dr. Melaine Rose

Jay and complained of back pain, leg swelling, and shortness of breath.  R. 113–14.  Dr. Jay

noted mild tenderness at the C4–T12 levels along the spine, R. 113, and indicated Cruz was

willing to try physical therapy, R. 114.  In November 2006, Dr. Jay noted that Cruz was obese

and discussed weight loss with her.  R. 112.  Dr. Jay also noted that Flonase was helping Cruz's

allergic rhinitis and that Cruz reported doing physical therapy weekly.  Id.

---

[5]  Venous insufficiency is defined as "inadequate drainage of venous blood from a part,
resulting in edema or dermatosis."  Stedman's at 908.

On April 4, 2007, Dr. Dyana Aldea, a consultative physician, examined Cruz.  R. 142–44.  Cruz complained of radiating back pain with swelling, numbness, and tingling, which was reportedly aggravated by prolonged standing, ambulation, bending, squatting, lifting, and climbing, and was relieved with rest and medications.  R. 142.  Dr. Aldea noted that Cruz's gait was normal.  R. 143.  She was able to walk on her heels and toes without difficulty and do a full squat.  Id.  She used a cane that was not medically necessary, and she needed no assistance changing, getting on and off the exam table, or rising from her chair.  Id.  Her musculoskeletal exam was normal except for mild tenderness to palpation in the lumbar spine.  Id.  A lumbosacral spine X-ray showed straightening of the lordic curve.  Id.  Dr. Aldea found that Cruz had "no limitation for physical activity."  R. 144.  On April 12, 2007, a disability analyst for the state agency, S. Mastrogiacomo, issued a review of Cruz's records.  R. 40, 44, 146–51.  He noted that no treating source opinion was available concerning Cruz's physical residual functional capacity ("RFC") and that, based on the medical evidence and the claimant's report of functioning, she was not disabled.  R. 150–51.

Cruz attended physical therapy sessions at GDTC in December 2007.  R. 345–48, 356. The physical therapist noted that Cruz had "moderate tenderness and severe spasm" of her lumbar paraspinals.  R. 345.  Cruz informed the therapist that her pain lessened after physical therapy treatment.  Id.  On January 9, 2008, Dr. Gloria Rubin of GDTC reported the results from a CT scan of Cruz's spine, which revealed spinal stenosis.  R. 152.  Dr. Rubin also noted that Cruz experienced "low back pain aggravated by prolonged sitting and ambulation."  Id.[6]

---

[6]  The Appeals Council's remand order references this opinion of Dr. Rubin.  R. 279–80.

6

In February 2008, Cruz sought treatment at Bellevue Hospital's pain management clinic. R. 349–50.  Dr. Lisa Doan and Dr. Grzegorz Kozikowski indicated that Cruz used English but stated she preferred Spanish.  R. 349.  Cruz reported back pain radiating along her spine, aggravated by bending, as well as weakness in her legs and muscle spasms in her thighs.  Id. She identified her pain "at its worst" as a 6 out of 10 in severity.  Id.  She informed the doctors that physical therapy relieved her pain, and that medications upset her gastrointestinal system. Id. Drs. Doan and Kozikowski found that Cruz had a normal affect and full strength, and that she was obese and had scoliosis.  R. 349–50.  They diagnosed her with musculoskeletal disorder of the neck and noted a decreased ability to work.  R. 350.  Dr. Kosikowski examined Cruz again on March 12, 2008.  R. 382.  Cruz reported back pain with an intensity of four and nausea and vomiting caused by medications.  Id.  Dr. Kosikowski found all systems normal except pain during the musculoskeletal exam, and again noted a musculoskeletal disorder of the neck.  Id.

In December 2008, Dr. Lucia Voiculescu of Bellevue examined Cruz.  R. 355.  Dr. Voiculescu noted Cruz's preference for speaking Spanish, but indicated that she used English during the exam.  Id.  Cruz reported chronic low back pain with occasional bilateral radicular symptoms, cervical pain, and daily muscle spasms in the cervical and lumbar regions.  Id.  Dr. Voiculescu found full motor strength, normal cervical ranges of motion, and mildly limited lumbar ranges of motion.  Id.  Dr. Voiculescu prescribed medication and noted Cruz's obesity. Id.

In February 2010, Cruz returned to Bellevue where she was examined by Nurse Practitioner ("NP") Kathleen Broglio.  R. 353–54.[7]  Cruz's chief complaint was back and neck

---

[7]  Cruz asserts that this gap in treatment is due to her loss of Medicaid coverage.  Pl. Mem. at 6 n.13; see also R. 26.

pain.  R. 353.  NP Broglio indicated Cruz's preference for Spanish, but noted that she used

English throughout the exam.  Id.  She also noted that an MRI from January 2009 showed a

minimal diffuse bulge at L4-L5, mild bilateral hypertrophy, and a small epidural mass, "most

likely [an] extruded disc at S1."  Id.  Cruz stated that physical therapy did not benefit her and

that her medications hurt her stomach.  Id.  NP Broglio found that Cruz had full range of motion

in the neck and lumbar spine without pain, straight leg raising was negative, and her strength and

gait were normal.  Id.  NP Broglio noted taut paraspinals from Cruz's cervical to low back area.

Id.  She prescribed medication, encouraged Cruz to exercise and lose weight, and suggested that

she follow up with a nutritionist.  R. 354.

    In July 2010, Cruz saw NP Broglio again, complaining of back pain and shoulder pain.

R. 377–78.  At this appointment, Cruz used Spanish, and told NP Broglio that she was not taking

her medications regularly because of gastrointestinal pain.  R. 377.  NP Broglio noted that

Cruz's gait was normal, her strength was full throughout, and paraspinals were less taut than at a

prior exam.  Id.  Cruz had lost 12 pounds.  Id.  NP Broglio noted sciatica and musculoskeletal

disorder of the neck, prescribed a gel, and advised Cruz to continue taking her other medications.

R. 378.

    In October 2010, Dr. David Finkelstein, a consultative neurologist, examined Cruz and

completed a form assessment of her physical abilities.  R. 359–68.  He noted that her gait was

antalgic but her station was normal, she could walk on toes and heels without difficulty, she did

not use a cane, and she could get in and out of her chair and on and off the exam table without

help.  R. 360.  Cruz had normal range of motion in the cervical, thoracic, and lumbar spine,

although lumbar flexion was limited to 60 degrees.  Id.  She had no muscle spasms or

tenderness, straight leg raising was negative, and she had no trigger points.  Id.  She had no

muscle atrophy and normal reflexes and muscle tone throughout.  R. 361.  Dr. Finkelstein noted that Cruz's low back pain "may limit ability to sustain activities" and that "there are some mild pain-related limitations in ambulation."  Id.

On the form, Dr. Finkelstein indicated Cruz could lift and carry up to 20 pounds continuously, 21 to 50 pounds frequently, and 51 to 100 pounds occasionally.  R. 362.  He stated that she could sit, stand, and walk each for three hours at one time without interruption.  R. 363.  She could sit, stand, and walk for a total of eight hours in a workday.  Id.  She could use her hands and feet continuously, R. 364, and could climb stairs, ramps, ladders, and scaffolds for over two to three hours continuously, and could balance, stoop, kneel, crouch, and crawl for the same amount of time, R. 365.  She had no environmental limitations.  R. 366.  She was able to shop, travel without assistance, ambulate without an assistive device, walk at a reasonable pace on an uneven surface, use public transportation, climb steps with a handrail, prepare a simple meal and feed herself, care for her personal hygiene, and sort, handle, or use paper files.  R. 367.

### 3.    The November 7, 2007 Hearing and ALJ Arzt's Denial of Benefits

On November 7, 2007, Cruz testified pro se through an interpreter before ALJ Arzt.  R. 21–39.  Cruz described her treatment for cellulitis in 2006.  R. 26–27.  She told ALJ Arzt that she understood "a little. . . a lot" of English.  R. 28.  She testified that she can write "very, very little" English and can read "a little" in English.  Id.  She can read and understand most articles in the Daily News and New York Post.  R. 29.  She can carry on simple conversations in English, can write lists of "some things" in English, and can write "very little" of a short note in English.  Id.  Cruz told ALJ Arzt that she has not worked in recent years because of her "condition."  R. 30.  She described her back pain as "burning" down her neck, "all the way

9

down." Id.  She testified that she had never been told the cause of her spinal pain.  R. 31.  She does not use a cane because she is scared of "getting so used to it, that I won't be able to walk right."  R. 32.  She said physical therapy had improved her pain, but that she stopped doing it, and that she did not always take her medicines because they hurt her stomach.  R. 32–33.  She has not had cellulitis since early 2006, but her legs get swollen.  R. 33–34.  She has been prescribed support hose but can only wear it in winter because it makes her hot.  R. 34.  She cannot walk more than half a block before she must stop and rest because of her back pain.  R. 35.  She cannot stand for long periods of time, and she cannot sit for longer than half an hour.  R. 35–36.  She cannot carry a gallon of milk.  R. 37.  She does very little cooking, and can perform some house cleaning, although it sometimes aggravates her back pain.  R. 37–38.

4.     The March 1, 2011 Hearing

Cruz testified pro se through an interpreter at a hearing on remand before ALJ Solomon on March 1, 2011.  R. 205–24.  She stated that she understood some English, and spoke to some doctors in Spanish and some in English.  R. 210.  She testified that she is able to write in English a "very little" bit.  Id.  She informed ALJ Solomon that she is getting treatment for her back, stomach, and legs, and has been prescribed special hose for her legs to prevent swelling.  R. 211.  Her only treatment is medication.  Id.  She testified that she has gotten worse since November 2007, because "it's affected all my left side and my left arm also."  Id.  She does not use a cane, and said she is able to travel by herself but loses her balance sometimes and prefers to travel with her son.  R. 212.  She spends her days at home, praying, "sing[ing] to the lord," and reading the Bible; she also feels depressed.  Id.

ALJ Solomon then took testimony from a medical advisor, Dr. Thomas H. Weiss.  R. 213–20.  Dr. Weiss had listened to Cruz's testimony and reviewed her medical records.  R. 214.

He testified that Cruz had degenerative disc disease in her neck, hypertrophy in the thoracic

spine, and mild spinal stenosis.  R. 215.  He discussed an X-ray from 2007, which showed

swelling in her left ankle.  R. 216.  He also found that she had minimal scoliosis.  Id.  He found

that her impairments did not meet or medically equal any of the listed impairments.  R. 217.  He

testified that Cruz had no limitations on her ability to lift or carry, id., she could stand and walk

for at least six hours, R. 219, and she could sit at least six hours, id.  She had no other exertional

or non-exertional impairments.  Id.

Finally, a vocational expert, Melissa Fass Karlin, testified.  R. 221.  ALJ Solomon asked

the following question:

> [A]ssume I find that the claimant has the ability to do work at the light level, which is the
> ability to sit, stand, and walk for at least six hours, to carry 20 pounds occasionally, or 10
> pounds frequently, and limited to occasional climbing ramps and stairs, bouncing,
> stooping, kneeling, crouching, and crawling.  Assuming a hypothetical claimant the age,
> education, and work experience, and for this purpose we're going to find that the
> claimant does speak some English because, obviously, the grids are the grids if she does
> speak Spanish.

R. 221–22.

The vocational expert responded that such an individual "could do the full range, then, of

light work," and the full range of sedentary work.  R. 222.  ALJ Solomon then asked whether,

crediting Cruz's testimony regarding her limitations, a hypothetical individual with such

limitations would be able to perform any work, and the vocational expert responded in the

negative.  Id.

### 5.      The ALJ's April 22, 2011 Decision

On April 22, 2011, ALJ Solomon issued a decision in which he found Cruz not entitled to

disability insurance benefits.  R. 173–180.  His findings of fact and conclusions of law are as

follows:

1.  The claimant has not engaged in substantial gainful activity since March 1, 2007 . . . .

2.  The claimant has the following severe impairments: degenerative disc disease in the neck, ligamentous hypertrophy in the thoracic spine, mild spinal stenosis, scoliosis, and left ankle pain . . . .

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 . . . .

4.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except that she can only occasionally perform kneeling, crouching, stooping, crawling, or climbing of ramps and stairs.

5.  The claimant has no past relevant work . . . .

6.  The claimant was born on June 5, 1958, and was 48 years old, which is defined as a younger individual age 18–49, on the date the application was filed.  The claimant subsequently changed age category to closely approaching advanced age . . . .

7.  The claimant has a limited education and is able to communicate in English . . . .

8.  Transferability of job skills is not an issue because the claimant does not have past relevant work . . . .

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10.  The claimant has not been under a disability, as defined in the Social Security Act, since March 1, 2007, the date the application was filed . . . .

R. 175–80.

ALJ Solomon noted the inconsistencies in previous applications, which he had been instructed to address on remand, and discussed his efforts to contact Dr. Rubin, one of Cruz's treating physicians.  R. 173.  He also acknowledged giving "special consideration" to the listings for musculoskeletal disorders in determining the third finding.  R. 176.  With respect to his fourth finding, the ALJ's conclusions were based in part on a determination that Cruz's "alleged

severe restrictions with standing and walking . . . are inconsistent with the generally minimal

objective findings.  The evidence and treatment notes show mild back symptoms with

conservative treatment."  R. 178.  While the ALJ found that the "medically determinable

impairments could reasonably be expected to cause the alleged symptoms," Cruz's "statements

concerning the intensity, persistence and limiting effects of these symptoms are not credible to

the extent they are inconsistent with the above residual functional capacity assessment."  R. 178.

Finally, with regard to the tenth finding, the ALJ stated that he based this finding on the

testimony of the vocational expert that a hypothetical individual with Cruz's limitations and

background could perform the full range of light and sedentary work.  R. 179.

II.     GOVERNING LAW

A.      Scope of Judicial Review under 42 U.S.C. § 405(g)

A court reviewing a final decision by the Commissioner "is limited to determining

whether the [Commissioner's] conclusions were supported by substantial evidence in the record

and were based on a correct legal standard."  Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013)

(citation and internal quotation marks omitted); accord Burgess v. Astrue, 537 F.3d 117, 127 (2d

Cir. 2008); see generally 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social

Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").

Substantial evidence is "'more than a mere scintilla.  It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.'"  Richardson v. Perales, 402

U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938));

accord Burgess, 537 F.3d at 127–28; Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006);

Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotation marks omitted).  Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.")).  The Second Circuit has characterized the substantial evidence standard as "a very deferential standard of review — even more so than the 'clearly erroneous' standard." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (citation omitted).  The "substantial evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would have to conclude otherwise." Brault, 683 F.3d at 448 (emphasis in original) (citation and internal quotation marks omitted).  "The role of the reviewing court is therefore quite limited and substantial deference is to be afforded the Commissioner's decision." Johnson, 563 F. Supp. 2d at 454 (citations and internal quotation marks omitted).

B.    Standard Governing Evaluations of Disability Claims by the Agency

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).  A person will be found to be disabled only if it is determined that her "impairments are of such

severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  Id. § 423(d)(2)(A).

To evaluate a Social Security claim, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted).

Regulations issued pursuant to the Social Security Act set forth a five-step process that the Commissioner must use in evaluating a disability claim.  See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Burgess, 537 F.3d at 120 (describing the five-step process).  First, the Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity."  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," id. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities . . . ."  Id. §§ 404.1520(c), 416.920(c).  Third, if the claimant's impairment is severe and is listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, or is equivalent to one of the listed impairments, the claimant must be found disabled regardless of his age, education, or work experience.  Id. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  Fourth, if the claimant's impairment is not listed and is not equal to one of the listed impairments, the Commissioner must review the claimant's residual functional capacity to determine if the claimant is able to do work he or she has done in

the past, i.e., "past relevant work."  Id. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  If the claimant

is able to do such work, he or she is not disabled.  Id.  Finally, if the claimant is unable to

perform past relevant work, the Commissioner must decide if the claimant's residual functional

capacity permits the claimant to do other work.  Id. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  If

the claimant cannot perform other work, he or she will be deemed disabled.  Id.  The claimant

bears the burden of proof on all steps except the final one — that is, proving that there is other

work the claimant can perform.  See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per

curiam).

> C.      Duty to Develop the Record

The ALJ has an affirmative duty to develop the record in a disability benefits case.

Shaw, 221 F.3d at 131.  Where the ALJ fails to develop the record, remand is appropriate.  Rosa

v. Callahan, 168 F.3d 72, 82–83 (2d Cir. 1999).  The ALJ has a "duty to investigate the facts and

develop the arguments both for and against granting benefits . . . ."  Sims v. Apfel, 530 U.S. 103,

111 (2000).  The ALJ's duty to develop the administrative record encompasses not only the duty

to obtain a claimant's medical records and reports, but also the duty to question the claimant

adequately about any subjective complaints and the impact of the claimant's impairments on the

claimant's functional capacity.  See, e.g., Cruz v. Sullivan, 912 F.2d 8, 11–12 (2d Cir. 1990);

Echevarria v. Sec'y of Health & Human Servs., 685 F.2d 751, 755–56 (2d Cir. 1982).  The

governing statute provides that the ALJ "shall make every reasonable effort to obtain from the

individual's treating physician (or other treating health care provider) all medical evidence,

including diagnostic tests, necessary in order to properly make" the disability determination.  42

U.S.C. § 423(d)(5)(B); accord 20 C.F.R. §§ 404.1512(d), 416.912(d).  The ALJ's duty to

develop the record remains the same regardless of whether the claimant is represented by

counsel.  Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999) (citing Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996)).

III.   DISCUSSION

Cruz argues in her motion for judgment on the pleadings that the ALJ's decision was erroneous for the following reasons: (1) the ALJ failed to comply with the remand order issued by the Appeals Council and/or failed to develop the record, see Pl. Mem. at 11–15; (2) the ALJ erroneously assessed Cruz's residual functional capacity, see id. at 15–26; and (3) the ALJ's decision was not supported by substantial evidence, see id. at 26–29.  We discuss each separately.

A.   Whether the ALJ Complied with the Remand Order and/or His Duty to Develop the Record

Cruz argues that the ALJ failed to comply with his affirmative duty to develop the record and that he failed to resolve certain inconsistencies.  Id. at 11–15.  Specifically, Cruz argues that the ALJ erred in failing to obtain additional information about Dr. Rubin's assessment that Cruz's low back pain was aggravated by prolonged sitting and walking.  Id. at 12; R. 152.

The Appeals Council's order required the ALJ to "obtain additional evidence concerning the claimant's musculoskeletal impairments."  R. 280.  The ALJ in fact did this by examining records of treatment since the prior hearing and obtaining testimony from a medical expert.  R. 177–78.  The remand order stated that the additional evidence "may" include, inter alia, updated records from Dr. Rubin, "if warranted and available."  R. 280.  ALJ Solomon attempted to contact Dr. Rubin, sending her two separate letters, but never received a response with the requested clarifications.  R. 173, 178.

17

The Court cannot find that the remand order was violated or that the ALJ otherwise failed to discharge his duty to develop the record.  When it is not possible "to fully credit a treating physician's opinion because the medical records from the physician are incomplete or do not contain detailed support for the opinions expressed," the ALJ has a duty to request missing or incomplete information, as well as to recontact the treating physician to clarify his or her opinions.  Correale-Englehart v. Astrue, 687 F. Supp. 2d 396, 428 (S.D.N.Y. 2010) (citing Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996)); accord Rosa, 168 F.3d at 79.  Under the governing regulations, however, the ALJ need only make "every reasonable effort" to get medical reports from treating physicians.  20 C.F.R. § 404.1512(d).  The regulations specifically define this effort as "an initial request for evidence from [plaintiff's] medical source[s], and "one follow-up request."  20 C.F.R. §§ 404.1512(d)(1), 416.912(d)(1).  Here, the ALJ fulfilled his duty when he contacted Dr. Rubin twice.  R. 173.  Dr. Rubin responded to the first request by simply returning copies of Cruz's physical therapy evaluations and noting that the ALJ had failed to include a medical source questionnaire in his letter.  R. 305, 344.  She did not respond to the request for clarification of her reports and her observations of Cruz's language abilities.  R. 344.  As for the second request, Dr. Rubin never responded to it at all.  R. 178, 305.  The ALJ's efforts not only followed the regulations but were inherently reasonable.  As a result, they complied with the remand order and his duty to develop the record.

Cruz attaches to her brief a short handwritten note from Dr. Rubin dated September 13, 2012, many months after this lawsuit was filed, ostensibly clarifying her opinion as requested.  See Note, dated Sept. 13, 2012 (annexed as Ex. C. to Pl. Mem.).  Cruz provides no explanation as to how she obtained this note a year and a half after ALJ Solomon requested information from Dr. Rubin, or why Dr. Rubin failed to respond to the ALJ's letter.  Nor does she supply any legal

authority as to why the note could be considered by this Court now.  The ALJ's decision to proceed without Dr. Rubin's clarification after making reasonable efforts to obtain the information was not erroneous, and Cruz's ability to obtain a response from Dr. Rubin a year and a half later does not affect the propriety of the ALJ's actions.

Cruz also argues that the ALJ erred by not advising Cruz to contact Dr. Rubin herself. Pl. Mem. at 12–15.  But no such obligation exists under the regulations.  In the case relied on by Cruz, Cruz v. Sullivan, 912 F.2d 8 (2d Cir. 1990), the Court found that the ALJ had not made a sufficiently reasonable effort to obtain additional information, and noted that "[h]ad [the plaintiff] been apprised of the ALJ's skepticism, he, unlike the ALJ, may have been persistent about obtaining his medical records and a detailed statement from [his doctor]."  Id. at 12.  But to the extent any such obligation exists, it has been applied only where the ALJ does not adequately attempt to seek out the relevant records.  See, e.g., Jimenez v. Massanari, 2001 WL 935521, at *11–12 (S.D.N.Y. Aug. 16, 2001); Rosa v. Apfel, 1998 WL 437172, at *4 (S.D.N.Y. July 31, 1998).  Here, the ALJ himself properly sought the additional information and he was not required to ask Cruz to repeat the steps he had already undertaken.

Cruz includes the failure to "give consideration to the treating physician" in a list of alleged errors the ALJ made in his decision, Pl. Mem. at 11, though she does not directly argue that ALJ Solomon violated the "treating physician rule."  Assuming arguendo that Cruz seeks to make this argument, it is rejected.  Under the treating physician rule, an ALJ must accord "a measure of deference to the medical opinions of a [social security claimant's] treating physician."  Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004).  The ALJ must give "controlling weight" to a treating physician's medical opinion as to the nature and severity of a claimant's impairments if the opinion "is well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record."  20 C.F.R. § 404.1527(c)(2); accord Morales v. Astrue, 2012 WL 414236, at *7 (S.D.N.Y. Feb. 9, 2012) (citation omitted).  Inversely, the opinions of a treating physician "need not be given controlling weight where they are contradicted by other substantial evidence in the record," Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) (citations omitted), including "the opinions of other medical experts," Halloran, 362 F.3d at 32, because "[g]enuine conflicts in the medical evidence are for the Commissioner to resolve," Veino, 312 F.3d at 588 (citing Richardson, 402 U.S. at 399); accord Burgess, 537 F.3d at 128.

If the opinion of a treating physician is rejected, the ALJ must "provide good reasons for the weight [given] to the treating source's opinion."  Halloran, 362 F.3d at 32–33 (internal quotation marks omitted) (citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998)).  When assessing how much weight to give the treating source's opinion, the ALJ should consider factors set forth in the Commissioner's regulations, which include: (i) the length of the treatment relationship and the frequency of the examination; (ii) the nature and extent of the treatment relationship; (iii) the supportability of the opinion with relevant evidence, particularly medical signs and laboratory findings; (iv) the consistency of the opinion with the record as a whole; (v) whether the opinion is from a specialist; and (vi) other relevant evidence.  See 20 C.F.R. § 404.1527(c)(2)–(6); see also Ellington v. Astrue, 641 F. Supp. 2d 322, 330–31 (S.D.N.Y. 2009) (the ALJ "should weigh the treating physician's opinion along with other evidence according to the factors" listed in 20 C.F.R. § 404.1527(c)(2)–(6)).

In rendering a decision, ALJ Solomon considered Dr. Rubin's statement that Cruz's back pain was aggravated by prolonged sitting and standing, but found that the opinions of the consultative examiners were entitled to greater probative weight.  R. 178.  Specifically, the ALJ

found that Dr. Rubin's opinion was inconsistent with medical documentation.  Id.  The record

reflects that Dr. Rubin's opinion was contradicted by reports from Drs. Aldea, Doan,

Kozikowski, Voiculescu, and Finkelstein, and NP Broglio, who actually treated Cruz.[8]  R.

142–44, 349–50, 355, 359–61, 362–67, 377–78, 382.  The medical records indicated mild

symptoms and "minimal objective findings" and neither the consultative examining sources nor

the medical expert found that Cruz was limited to less than light work.  R. 178.  Moreover, Cruz

received conservative treatment throughout.  Id.  Therefore, the ALJ was not required to give Dr.

Rubin's unclarified views "controlling weight" inasmuch as her opinion was inconsistent with

other substantial evidence in the administrative record.  See Mongeur, 722 F.2d at 1039 ("[T]he

opinion of a treating physician is not binding if it is contradicted by substantial evidence, and the

report of a consultative physician may constitute such evidence.") (citations omitted).

Furthermore, the ALJ gave "good reasons" for disregarding Dr. Rubin's opinion, including the

inconsistency of her opinion with the entirety of the record and her failure to respond to requests

for clarification.  R. 178.  The ALJ's decision therefore did not violate the treating physician

rule.

      Finally, Cruz argues that ALJ Solomon incorrectly assessed her ability to speak English

by relying solely on his firsthand experience of communicating with her at the hearing and by

noting that "during the hearing, . . . Cruz began to respond to some questions asked without

having the questions interpreted."  Pl. Mem. at 13–15.  This argument fails.  ALJ Solomon found

that Cruz was "able to communicate in English," citing 20 C.F.R. 416.964.  R. 179.  That

---

   [8]  NP Broglio's reports may be considered pursuant to 20 C.F.R. §§ 416.913(a), (d) as an "other source" to "show the severity of [Cruz's] impairment(s) and how it affects [her] ability to work."

regulation, which requires that a claimant's ability to communicate in English be considered as a factor relating to her ability to work, refers only to a claimant's ability to "speak and understand English," 20 C.F.R. 416.964(b)(5), an ability that the ALJ observed firsthand as well as one that was supported in the record. The record contained substantial evidence of Cruz's English abilities, including Cruz's own testimony about her ability to speak English and the reports of numerous doctors in the record that Cruz had spoken to them in English. R. 28, 29, 210, 349, 353, 355. Furthermore, ALJ Solomon considered Dr. Rubin's reports about Cruz's ability to speak English. R. 177 (noting that the records produced by Dr. Rubin indicated that Cruz "used English with the staff at Gouverneur").

B.    Whether the ALJ's RFC Determination Was Proper

Cruz argues that the ALJ erred in several aspects when determining her residual functional capacity. First, Cruz argues that ALJ Solomon failed to consider both Dr. Rubin's opinion that prolonged sitting and walking aggravated Cruz's low back pain as well as the impact of her leg edema and chronic venous insufficiency. Pl. Mem. at 15–16. However, for the reasons stated in the previous section, the ALJ did consider the records of Dr. Rubin. R. 177–78. Additionally, the ALJ considered Cruz's edema and chronic venous insufficiency, noting "hyperpigmentation consistent with venous stasis changes and pitting edema" in 2006, R. 176, "no edema" in 2008, and "2+ edema" in 2009, R. 177. His finding of certain limitations, see R. 176 ("[S]he can only occasionally perform kneeling, crouching, stooping, crawling, or climbing of ramps and stairs"), shows that the ALJ thoroughly considered these conditions in his decision.

Cruz also argues that ALJ Solomon erred in failing to discuss Cruz's physical abilities on a function-by-function basis. Pl. Mem. at 17–18. As an initial matter, we note that the Second Circuit has never held that an ALJ must conduct "a function-by-function analysis, and the Third

22

and Sixth Circuits have specifically ruled that such an analysis is not required." Daniels v.

Astrue, 2012 WL 1415322, at *12 (S.D.N.Y. Apr. 18, 2012) (citing Dillingham v. Astrue, 2010

WL 3909630, at *11 (N.D.N.Y. Aug. 24, 2010), adopted, 2010 WL 3893906 (N.D.N.Y. Sept.

30, 2010); Diaz v. Astrue, 2010 WL 3257779, at *9 (S.D.N.Y. Aug. 17, 2010)).   Numerous

courts in this district have reached a similar conclusion and we agree that there is no per se

requirement that an ALJ perform a "function-by-function" analysis of her abilities.  See id. at

*12–13; Juliano v. Astrue, 2012 WL 1232961, at *8 (S.D.N.Y. Apr. 12, 2012) ("[T]he ALJ's

written opinion need not discuss each function, especially those functions for which no

limitation is alleged."); Novak v. Astrue, 2008 WL 2882638, at *3 (S.D.N.Y. July 25, 2008);

Casino-Ortiz v. Astrue, 2007 WL 2745704, at *13 (S.D.N.Y. Sept. 21, 2007), adopted, 2008 WL

461375 (S.D.N.Y. Feb. 20, 2008).  Instead, it is enough for the ALJ to "explain how the evidence

supports his or her conclusions about the claimant's limitations and [to] discuss the claimant's

ability to perform sustained work activities."  Casino-Ortiz, 2007 WL 2745704, at *13 (internal

citations and quotation marks omitted).

Here, ALJ Solomon thoroughly discussed Cruz's functional work-related abilities and

explained his reasons for arriving at his assessment of those abilities.  R. 178.  He discussed the

findings of Drs. Weiss and Finkelstein as to each of Cruz's physical abilities and explained his

reasons for crediting these findings.  Id.  Cruz's argument that the ALJ failed to "provide[] a

narrative discussion describing how the evidence supports each conclusion, citing specific

medical facts, and non medical evidence," Pl. Mem. at 18, ignores the entirety of the ALJ's

decision, in which he reviews her abilities and the medical records to determine her RFC, see R.

176–78.

Cruz argues that ALJ Solomon erred by not taking into account her "non exertional limitations of pain and obesity before determining her RFC."  Pl. Mem. at 18.  In determining whether a claimant is disabled, Social Security regulations require an ALJ to "consider all [of a claimant's] symptoms, including pain, and the extent to which [the] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  20 C.F.R. § 404.1529(a).  The claimant's reported symptoms are not to be accepted as conclusive of the existence of a disability, however, but rather must be analyzed in the context of all the relevant evidence.  Id.  As the regulations state:

> Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions which you, your treating or nontreating source, or other persons report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . in reaching a conclusion as to whether you are disabled.  We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating or nontreating source, and observations by our employees and other persons. . . .  We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence, including your history, the signs and laboratory findings, and statements by your treating or nontreating source or other persons about how your symptoms affect you.

Id. § 404.1529(c)(3), (c)(4).  In his opinion, ALJ Solomon stated that while Cruz's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," Cruz's claims of severe pain "are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  R. 178.  In particular, the objective findings from Cruz's numerous medical exams were "generally minimal," and she received "conservative treatment." Id.  The ALJ also noted that Cruz can "only occasionally perform kneeling, crouching, stooping, crawling, or climbing of ramps and stairs."  R. 176.

24

Cruz is correct in arguing that, where a claimant's subjective testimony is rejected for lack of credibility, the ALJ must do so explicitly and specifically.  Williams v. Bowen, 859 F.2d 255, 260–61 (2d Cir. 1988) (where an ALJ rejects witness testimony as not credible, it must set forth the basis for this finding "with sufficient specificity to permit intelligible plenary review of the record") (citing Carroll v. Sec'y of Health and Human Servs., 705 F.2d 638, 643 (2d Cir. 1983)); accord Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999).  But that is exactly what occurred here.  In finding Cruz's subjective complaints of pain not credible, the ALJ provided a basis for this finding by discussing Cruz's complaints in the context of the complete medical record.

As for the ALJ's accounting for the effect of Cruz's obesity on her functional abilities, Pl. Mem. at 21–22, the ALJ discussed the various doctors' assessment of Cruz's weight, see R. 177.  But "obesity is not in and of itself a disability," and "an ALJ's failure to explicitly address a claimant's obesity does not warrant remand."  Guadalupe v. Barnhart, 2005 WL 2033380, at *6 (S.D.N.Y. Aug. 24, 2005) (citing Evaluation of Obesity, SSR 00–3p, 2000 WL 33952015 (May 15, 2000)).  "An ALJ's final determination can constitute an appropriate consideration of the effects of obesity if it properly weighs evaluations by doctors that have accounted for the claimant's obesity."  Paulino v. Astrue, 2010 WL 3001752, at *18 (S.D.N.Y. July 30, 2010).  Here, the ALJ discussed Cruz's weight in the context of the medical examinations and considered the findings of the medical examiners as a whole.  R. 177.  In these circumstances, the ALJ was not required to "single out" the claimant's obesity in his decision.  Cruz v. Barnhart, 2006 WL 1228581, at *9 (S.D.N.Y. May 8, 2006).

Cruz argues that the ALJ erred in eliciting testimony from the vocational expert in two ways: (1) she argues that the questions posed to the vocational expert were insufficiently

representative of Cruz's limitations, and (2) she argues that the questions were insufficiently hypothetical and were specifically about Cruz herself.  Pl. Mem. at 23–25.  Putting aside the potential inconsistency in these arguments, they fail on the merits.  ALJ Solomon asked about an individual with "the ability to sit, stand, and walk for at least six hours, . . . limited to occasional climbing ramps and stairs, bouncing, stooping, kneeling, crouching, and crawling."  R. 221–22.  These limitations were supported by the record.  The ALJ was not required to credit Cruz's assertion that she must be "allowed to sit and stand at will," Pl. Mem. at 23, as there was evidence in the record to support the conclusion that she could sit or stand for hours at a time, R. 144, 363.

Cruz's argument that the ALJ incorrectly asked "specifically . . . about Ms. Nunez Cruz" is equally meritless.  The ALJ's questions were framed as a hypothetical: he referred to a "hypothetical claimant the age, education, and work experience [of the claimant]."  R. 222.  Cruz does not provide any further elaboration or explanation of this claim.  The cases relied on by Cruz address situations where hypothetical questions failed to include subsequently-obtained medical records, see Jehn v. Barnhart, 408 F. Supp. 2d 127, 135–37 (E.D.N.Y. 2006), or where a vocational expert's testimony conflicted with the Dictionary of Occupational Titles, see Sanchez v. Barnhart, 329 F. Supp. 2d 445, 453–54 (S.D.N.Y. 2004).  These cases are not analogous to the instant case and Cruz has provided no explanation of their relevance.

Cruz also argues that the ALJ failed to take into consideration the impact of Cruz's limitations on her ability to take public transportation.  Pl. Mem. at 24–26.  It is unclear, however, why this issue is relevant to the ALJ's determination of disability.  In any event, the ALJ in fact considered whether Cruz could use public transportation, and found that she was able to do so.  R. 178.  Dr. Finkelstein noted Cruz's ability to use public transportation despite her

physical limitations in his consultative examination.  R. 367.  The Court notes further that Cruz's

argument incorrectly assumes that the use of public transportation necessarily means that Cruz

would be required to use stairs in a subway.  Pl. Mem. at 24, 25.  In fact, there exist

transportation options for individuals who are unable to use the subway systems or stairs.

C.     Whether the ALJ's Decision is Supported by Substantial Evidence

Cruz argues that the ALJ's decision is not supported by substantial evidence, urging the

Court to "rule in favor of the claimant" because the record "compel[s] any fair-minded person to

conclude that [the claimant] cannot work."  Id. at 26 (internal quotation marks and citations

omitted).  But this portion of her brief, see id. at 26–29, contains no new arguments.  Instead, it

reiterates arguments previously made in the brief, including arguments that the ALJ improperly

discredited Cruz's subjective complaints of pain and improperly assessed her ability to speak

English, and asserting that these errors resulted in a misapplication of the Medical Vocational

Guidelines.  Id. at 26–29.  These arguments have been rejected for the reasons already stated

above.  In light of the fact that there was substantial evidence supporting the ALJ's finding as to

Cruz's RFC, there was no misapplication of the Medical Vocational Guidelines.

V.     CONCLUSION

The Commissioner's motion for judgment on the pleadings (Docket # 20) is granted.

Cruz's motion for judgment on the pleadings (Docket # 25) is denied.  The Clerk is requested to

enter judgment and to close this case.

Dated: April 24, 2013
        New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge